IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENISE C. SWIFT,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )     No.  03 C 6859
                                    )
JOHN E. POTTER, Postmaster General )
of the United States Postal         )
Service,                            )
                                    )
                Defendant.          )

MEMORANDUM OPINION AND ORDER

Denise Swift ("Swift") initially brought a three-count
Complaint against Postmaster General John E. Potter of the United
States Postal Service ("Postal Service").  Count I asserted that
the Postal Service had violated Title VII of the Civil Rights Act
(42 U.S.C. §§2000e to 2000e-17) by terminating Swift on the basis
of her race and gender, while Count II asserted that the Postal
Service had violated the Age Discrimination in Employment Act (29
U.S.C. §§621 to 634) by terminating her on the equally
impermissible basis of her age and Count III claimed that the
Postal Service had terminated her on the basis of a disability,
in that respect running afoul of the Rehabilitation Act of 1973
("Rehabilitation Act," 29 U.S.C. §794).

After Swift voluntarily dismissed Counts I and II at the
completion of discovery, Postal Service brought a Fed. R. Civ. P.
("Rule") 56 motion for summary judgment on the final remaining
claim.  For the reasons set out in this memorandum opinion and

order, Postal Service's motion is granted and this action is dismissed.

## Summary Judgment Standards

Familiar Rule 56 principles impose on movant Postal Service the burden of establishing the lack of a genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23(1986)). For that purpose this Court must "consider the evidentiary record in the light most favorable to the nonmoving party...and draw all reasonable inferences in [her] favor" (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)). To avoid summary judgment the nonmovant "must produce more than a scintilla of evidence to support [her] position" that a genuine issue of material fact exists" (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)). This Court will award summary judgment to the movant only where a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

## Evidentiary Issues

This District Court's LR 56.1 requires both (1) that the movant file a "statement of material facts" organized by numbered paragraphs, each with a specific citation to the evidentiary record (LR 56.1(a)(3)) and (2) that the nonmovant file a paragraph-by-paragraph response to that statement, also with specific record citations (LR 56.1(b)(3)(A)). If the nonmovant

chooses to assert "additional facts," she must do so in a separate statement (LR 56.1(b)(3)(B); Ammons v. Aramark Unif. Servs., Inc., 368 F.3d 809, 817 (7th Cir. 2004)).

To serve the important purpose of LR 56.1--to expose the existence or nonexistence of material factual disputes--our Court of Appeals has consistently authorized District Courts to require strict adherence to its requirements and to penalize violations by disregarding a party's noncompliant factual statements (see, e.g., Ammons, 368 F.3d at 817-18; Brengettcy v. Horton, 423 F.3d 674, 681 (7th Cir. 2005)). District Courts are also authorized simply to adopt the opposing party's statements when a party fails to comply (see, e.g., Ammons, 368 F.3d at 817-18; Brengettcy, 423 F.3d at 681).

Here Postal Service properly filed its LR 56.1(a)(3) statement of material facts ("Statement") together with its summary judgment motion, but Swift has not responded in the manner mandated by LR 56.1 (b)(3)(A).[1]  Curiously, Swift eschewed the required paragraph-by-paragraph response format in favor of a response that lists the six facts she claims are disputed, not all of which claimed disputes are supported by specific record citations. Instead her six "disputed facts" more closely approximate a statement of "additional facts" that she is

_____

[1]  This opinion cites to Postal Service's Statement of Material Facts as "P. St. ¶--" and to Swift's responsive statement as "S. St.--."

3

entitled to submit under LR 56.1(b)(3)(B), because none of them directly contradicts the factual assertions in Postal Service's Statement.

This Court will not automatically adopt the strict--though caselaw authorized--approach of rejecting Swift's noncompliant offering, treating it instead as an attempted Rule 56(e) submission. But even viewed through that more generous lens, Swift's six statements, some of which are merely unsupported conclusions, offer little if anything having potential import.

Swift's first and third so-called "facts"--that Postal Service's "reliance on medical examiner's report was unreasonable" and that "Dr. Kessler's medical report was unreasonable" (S. St. at 1)--are no better than conclusory assertions that Swift has not supported by any admissible record evidence. By the same token, Swift's sixth "fact"--that she "was not wrongfully employed while on sick leave" (id.)--is a conclusory characterization of her non-postal part-time work, but without her having offered any record evidence that she was actually in compliance with Postal Service's policies. Instead of identifying any record evidence to counter Postal Service's contention that she was wrongfully employed, Swift seeks to attack what she refers to as its illogical underlying syllogism.[2]

_____

[2] S. St. at 8 asserts:

The Postal Service's basis for terminating Swift seems

Once again Swift's approach does not meet the admissibility requirements of Rule 56(e).

Swift fares slightly better on the three remaining additional facts that she proffers. But analysis shows that they do not suffice to avert summary judgment either.

In one of those three submissions, Swift states "The Postal Service misstated Ross Garber's clinical findings" (S. St. at 1) that she was "suffering from serious psychological disorder" (<u>id.</u> at 3). In support she submits a letter that she believes contradicts Postal Service's claim that Garber found Swift "had absent or minimal symptoms of depression" (<u>id</u>. at 2-3). Ironically, the crediting of Swift's assertion that Garber's evaluation supports her having suffered from a serious and debilitating depressive disorder actually dooms her Rehabilitation Act claim--an irony developed more fully hereafter.

Swift also asserts as a purported fact that "The Postal

_____

to be based on the following syllogism:
   a. A disabled employee is incapable of working;
   b. Denise Swift was caught working at a jewelry store;
   c. Therefore, Swift was not disabled while on medical
      leave from the Postal Service.

That characterization of Postal Service's underlying logic is neither a fact nor evidence that supports Swift's rehabilitation claim. Indeed, Swift has never addressed her failure to follow Postal Service policy barring other unauthorized gainful employment while on sick leave, despite Postal Service's written requests that she explain her position.

Service's reasons for terminating Plaintiff are contradictory"
(S. St. at 1). That statement is even less of a "fact"--much
less a disputed one--than Swift's argument that Postal Service
should not be able to advance alternate theories in opposition to
her claim. Similarly, Swift says "The Postal Service did not
follow its own rules" (id.) but she does not point to any rules
or policies to substantiate that.

Swift simply argues instead that it was against Postal
Service policy for its outside psychiatric consultant, Dr.
Kessler, to determine that she was able to work even though he
misunderstood one of her doctor's diagnoses and did not review a
psychiatric assessment of Swift (S. St. at 7). But in doing so
Swift adduces no evidence as to just what Postal Service policies
require an outside consultant to consider when determining an
employee's ability to work.

Relatedly, Swift further urges this Court to find that
Postal Service's practice of allowing "a consulting psychiatrist
to base his medical conclusion that a postal employee, with a
documented illness, is capable of returning to work after a leave
of absence even if his recommendation is not based on physical
and psychological examinations" is "potentially dangerous," "far-
reaching" and "unreasonable" (S. St. at 7). In that respect,
however, even if Swift had offered evidence as to Postal
Service's actual policies and its consequences, it is not this

Court's function to evaluate them under her Rehabilitation Act claim.

In sum, because of Swift's almost complete noncompliance with LR 56.1, the factual matrix for this opinion is drawn solely from Postal Service's Statement. What follows reflects the operative facts in those terms.

<u>Background</u>

Swift is an African-American woman over the age of 40, who began working as a clerk with Postal Service in 1972 (P. St. ¶1). From 1993 until 1999 Swift worked as a Networks Planning Specialist at the Great Lakes Area Post Office, where her duties included both training and assisting northern Illinois postal officials in a variety of tasks (<u>id</u>.). In 1998 and 1999 Swift reported directly to Paul Liepert ("Liepert"), who in turn reported to Beverly Van Soest ("Van Soest") (<u>id</u>. ¶2).

In late August 1998 Swift first missed work due to a bout with depression, though initially she did not tell Postal Service about her mental impairment (P. St. ¶¶7-8). After her first absence Swift told Van Soest that she had missed work because of "personal problems" without specifying what they were (<u>id</u>. ¶8). Van Soest then issued Swift a letter of warning for being absent without leave ("AWOL")(<u>id</u>. ¶8). On September 1 Swift asked Liepert for several days of sick leave, which he granted, reminding her that she was required to provide sufficient

supporting medical documentation under Postal Service's Employee Labor Relations Manual ("Manual") (id. ¶9).[3]  As of September 18 Liepert had not yet received any supporting documentation from Swift, so he called her to remind her about the requirement (id. ¶10).

On September 24 Swift did submit a note to Van Soest from her physician, Dr. Jaharis, stating that Swift would not be able to work from September 1 to 24, but without offering any information about the nature of her illness (P. St. ¶11).  To assist her in determining whether Dr. Jaharis' note satisfied Postal Service policy, Van Soest sent it to the medical office director, Dr. Lillian Weiss, who then informed Van Soest that the information in the note was not sufficient (id. ¶12).

Both Liepert and Van Soest then communicated with Swift several times to remind her that Postal Service policy required her to submit medical documentation detailing the nature of her illness (P. St. ¶¶13-16).  Again Swift submitted a note from her doctor that merely stated she would be unable to work until mid-October.  That prompted Van Soest to write an October 29 letter directing Swift to submit acceptable documentation within five

---

[3]  Under Manual ¶513.364 "employees are required to submit medical documentation," which must "provide an explanation and the nature of the employee's illness or injury sufficient to indicate to management that the employee was (or will be) unable to perform his or her normal duties for the period of absence" (P. St. ¶4).

days (id. ¶10). Van Soest further informed Swift that she was in AWOL[4] status (id. ¶18). Throughout early November Swift continued to submit doctors' notes that failed to describe her illness, and Postal Service management continued to ask Swift to provide the requisite documents (id. ¶¶19-22).

Finally on November 16 Swift submitted medical documentation directly to Dr. Weiss that indicated she suffered from "severe reactive depression and panic attacks," which accounted for her absences and would prevent her from returning to work until January 2, 1999 (P. St. ¶23). Upon evaluating that note, Dr. Weiss determined that Swift was eligible for sick leave, but that she would have to submit additional documentation as to her treatment plan and prognosis (id. ¶24). Without disclosing Swift's condition, Dr. Weiss told Van Soest her findings (id.).

In turn Van Soest notified Swift that her recently submitted medical documentation sufficed to convert her status from AWOL to sick leave and that she would be paid accordingly (P. St. ¶25). Van Soest also told Swift that Postal Service required additional documentation describing her treatment plan and prognosis, along with a completed medical release form and copies of her relevant medical records (id.). Swift, however, never signed the medical release form (id. ¶26).

---

[4] Under Manual ¶ 513.365, "If acceptable proof of incapacitation is not furnished, the absence may be charged to annual leave, LWOP, or AWOL" (P. St. ¶4).

9

In mid-November 1998 Van Soest discovered that Swift, despite her sick leave from Postal Service, was working part-time at Finlay's jewelry counter ("Finlay's") in Carson's department store (P. St. ¶27).[5]  Under Manual ¶ 513.312 "An employee who is in sick leave status may not engage in any gainful employment unless prior approval has been granted by appropriate authority" (id. ¶5).  Van Soest believed that Swift was working at Finlay's without prior approval in violation of that Postal Service policy, so she tried unsuccessfully to reach Swift via telephone to discuss the matter (id. ¶28).  On November 24 Van Soest sent Swift a letter demanding that she meet with postal inspectors on November 30 to discuss her non-postal employment and informing her that failure to attend could lead to disciplinary action (id. ¶29).  When Swift failed to show up for the meeting or respond to the letter, Van Soest renewed her request in a December 7 letter (id. ¶30).

Throughout January 1999 Postal Service continued to communicate with Swift, requesting that she attend a meeting with postal inspectors and that she provide the additional documentation (P. St. ¶¶34-37).  On February 5 Swift submitted five documents from four different doctors directly to Dr. Weiss

_____

[5] Indeed, in an investigative memorandum dated January 20, 1999, postal inspectors confirmed Swift's employment at Finlay's during the time that she was claiming sick leave from Postal Service (id. ¶33).

(id. ¶38).  Dr. Weiss reviewed the documents, found that they contained contradictory information and referred the matter to an outside psychiatric consultant, Dr. Leonard Kessler (id. ¶39).

After evaluating Swift's documents Dr. Kessler rendered his opinion that Swift was at "full capacity from a psychiatric standpoint to work at her job as a Network Planning Specialist" (P. St. ¶41).  His report stated that he based his decision on three main facts:  (1) there was no psychiatric assessment provided, (2) Garber's report said that Swift had a Global Assessment of Functioning ("GAF")[6] score of 81 and (3) Swift had been working at Finlay's during her sick leave from Postal Service (id. ¶41).  After reviewing Dr. Kessler's written opinion, Van Soest informed Swift that based on Dr. Kessler's findings Postal Service still considered Swift AWOL and was

_____

[6] Neither party has adequately explained the GAF--its function, purpose or scoring--to this Court.  According to Swift the GAF test "is a tool used by psychiatrists to determine an individual's level of functioning" (S. St. at 3).  According to the record Swift's GAF score was 81, which Drs. Weiss and Kessler interpreted to mean that Swift was high functioning and able to report to work (id.).  According to Swift the GAF scoring system had actually been revised, and a score of 81 "no longer indicated a high level of mental health" (id.).  But her only basis for that position is a confusing section of the EEOC transcript where Dr. Weiss was questioned about her knowledge of the scoring system and its purported revisions (EEOC Tr. 317-18).  Postal Service has similarly failed to explain the GAF or the scoring discrepancies raised in the course of this matter.  Because it is Swift who wishes to hang her hat on that claimed discrepancy, it is her burden to have produced coherent admissible evidence demonstrating how Postal Service misused the GAF score to discriminate against her.  As discussed throughout this opinion, Swift has not met any of her burdens.

planning to remove her (id. ¶43).  When Swift did not respond to
that letter threatening removal, Van Soest sent her a notice of
proposed removal for her continued AWOL status and for being
employed at Finlay's while on sick leave status (id. ¶¶43-44).
Swift took no action, and Postal Service issued the notice of
removal on March 22, 1999 (id. ¶¶44-45).

Swift then rallied to file a complaint with EEOC, charging
that Postal Service discriminated against her when it removed her
from employment (Complaint ¶10).  After exhausting all of her
administrative remedies (id. ¶11), Swift obtained a right-to-sue
letter in June 2003 and filed this action on September 29, 2003
(id.).  At the close of discovery Postal Service moved for
summary judgment, which prompted Swift to abandon the race and
age discrimination counts in her Complaint. Briefing on Swift's
remaining claim has been completed.

<u>Rehabilitation Act Claim</u>

As explained in <u>Scheerer v. Potter</u>, 443 F.3d 916, 918 (7th
Cir. 2006) (adapted to this case), "to establish a prima facie
case under the Rehabilitation Act, [Swift] must show[7] that [she]
(1) suffers from a substantial limitation on a major life

---

[7] Although this opinion will employ terms such as "show" or
"demonstrate" or the like because the caselaw speaks in that
fashion, Swift's burden here is of course the lesser one of
identifying genuine issues of material fact, rather than that of
proving the matters discussed in the text.  This Court has
applied that lesser burden throughout the opinion.

activity (*i.e.*, [she] is disabled under the terms of the statute); (2) is otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodations; and (3) has suffered an adverse employment decision because of the disability."  As <u>Scheerer</u>, <u>id</u>., at 919 further explained, "[b]ecause of the similarities between the prima facie requirements under Rehabilitation Act and the Americans with Disabilities Act ("ADA," 42 U.S.C. §12111 <u>et seq</u>. (2000), we look to our case law under the ADA to determine whether a plaintiff has established [her] prima facie burden."

<u>Substantial Limitation on a Major Life Activity</u>

As for the first prong of her prima facie case, Swift must demonstrate that her depression caused a "substantial limitation in a major life activity."  <u>Mattice v. Mem'l Hosp. of South Bend, Inc</u>., 249 F.3d 682, 686 (7th Cir. 2001) (internal quotation marks omitted) explains that those activities "include such basic functions as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  Discussing the meaning of "substantial limitation," <u>Weiler v. Household Fin. Corp.</u>, 101 F.3d 519, 523 (7th Cir. 1996) (internal quotation marks omitted) states that a plaintiff must show that she "is either unable to perform a major life function or is significantly restricted as to the condition, manner or duration under which the individual can perform a particular

major life function, as compared to the average person in the general population." Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999)[8] further instructs that "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." Thus a plaintiff, due to her disability, "must be precluded from more than one type of job, a specialized job, or a particular job of choice" (id.at 492).

Swift has sought to produce sufficient evidence as to her being substantially limited in the major life activity of working. Based on her deposition testimony, doctors' notes and the EEOC proceeding transcripts, Swift asserts that she was "either prevented or severely restricted from" performing the functions of her job as a Networks Planning Specialist, as required by Sheerer, 443 F.3d at 919.

More specifically, Swift's deposition testimony reflects that she was physically unable to perform her regular duties at the Postal Service because of the debilitating effects of her depression (P. St. ¶47). Notes from Swift's doctors, though

---

[8] Sutton, id. at 492 noted the "conceptual difficulty" in including work as a "major life activity," because working is more of a "residual life activity." That is, a person's inability to work is likely attributable to an underlying handicap--such as caring for oneself--that makes it impossible to perform his or her occupation.

brief, generally corroborate her deposition testimony that she could not perform the functions of her job (P. St. Ex.7a to 7j). And to counter the obvious retort by Postal Service that her claimed inability to work is negated by her having worked part-time at Finlay's, Swift has produced evidence from her doctors that the low-stress single-task nature of jewelry sales was vastly different from her myriad responsibilities at the Postal Service.

In that latter respect, Swift's response misapprehends the main thrust of Postal Service's position. It argues principally that Swift was terminated for having failed to follow the procedure for non-Postal employment during sick leave, as outlined in Manual ¶ 513.312: "An employee who is in sick leave status may not engage in any gainful employment unless prior approval has been granted by appropriate authority." Nowhere does Swift refute Postal Service's contention that she failed to adduce any evidence that she had prior approval to work at the jewelry counter while on sick leave from the Postal Service.

But even apart from that unrebutted justification for Swift's termination, Sheerer, 443 F.3d at 919 teaches that a plaintiff contending that her illness substantially limited her ability to work must meet a "high standard," and Swift's alternate employment raises critical questions about her claim that she was generically unable to work.

In that regard, Swift has not submitted any evidence as to the unavailability of any other position within the Postal Service in which she could limit her stress by scaling back her responsibilities to a single task (P. St. ¶52).  Such cases as Weiler, 101 F.3d at 524 (internal quotation marks omitted) confirm that "an inability to perform a particular job for a particular employer is not sufficient to establish a substantial limitation on the ability to work; rather, the impairment must substantially limit employment generally."  It is not enough for Swift to show that she could not work as a Networks Planning Specialist--she must further demonstrate that she was unable to perform in the requisite broad range of jobs.

Swift cannot claim that she was excluded from a "broad range of jobs" at Postal Service, because she did not engage in an interactive process that would have informed her of other possible Postal Service employment options (see, e.g., Bultemeyer v. Fort Wayne Cmty. Schs., 100 F.3d 1281, 1284 (7th Cir. 1996)).  Because Swift repeatedly failed to return calls and to answer written correspondence from Postal Service personnel, no interactive process could take place.  Having tendered no evidence at all bearing on the Postal Service's ability to offer her a lower-stress position such as that provided by her retail jewelry sales job, Swift has failed to show that she was "substantially limited" in the major life activity of working.

16

Accordingly Swift has not created any material factual issue as to whether she was disabled in the sense defined by the statute, even though her deposition testimony indicates that from spring 1999 until "sometime in 2001" she was unable to work "at all in any kind of job." (S. Dep. 205-06). That testimony (credited for Rule 56 purposes), while possibly aiding her claim that she was substantially limited in her ability to work, proves fatal to the second element of her prima facie case--the subject next discussed.

Otherwise Qualified Individual

To succeed on her Rehabilitation Act claim, Swift must also demonstrate that she is a "qualified individual with a disability." That calls for a two-step inquiry under such cases as Weiler, 101 F.3d at 524 (internal quotation marks omitted). First Swift "must satisfy the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." Next Swift "must be able to perform the essential functions of the position held or desired, with or without reasonable accommodation." As Weiler, id. further explains, the plaintiff bears the burden of proof for both steps in the inquiry, and "[w]hether the plaintiff meets the 'qualified individual with a disability' definition is determined as of the time of the employment decision."

Neither party disputes that Swift can satisfy the

prerequisites for the position of Networks Planning Specialist, a position that she held from 1993 until 1999. But as for "perform[ing] the essential function of the position held," analysis shows that Swift faces an insurmountable hurdle.

Before this opinion proceeds to such an analysis of the "essential functions" of a Networks Planning Specialist, it must be remembered that in an important sense those functions are irrelevant--after all, during the critical time period Swift was admittedly not able to show up at work at all. She testified that she did not "feel capable of working at the Post Office" during the six-month period she was granted sick leave (S. Dep. 206-07.) And before EEOC, referring to that same six-month period, Swift admitted (S. EEOC Dep. 14; P. St. ¶47): "I was incapacitated, unable to fulfill the requirements of my position as a networks planning specialist." Indeed, she further stated that her condition deteriorated to such a degree that she was forced to terminate her part-time work at the jewelry counter and that she was not able to work again until May 2001--over two years after Postal Service had discharged her (S. Dep. 59, 205).

According to Swift's logic, Postal Service should have accommodated her by allowing her not to work at all. But <u>Byrne v. Avon Prods., Inc.</u>, 328 F.3d 379, 381 (7th Cir. 2003)[9] teaches

_____

[9] While that opinion vacated this Court's grant of summary judgment because of a perceived factual issue as to whether the employer there could be viewed as having been placed on notice of

18

that "[n]ot working is not a means to perform the job's essential function."  As Byrne, id. further instructs, "[i]nability to work for a multi-month period removes a person from the class protected by the [Rehabilitation Act]."  Through her own testimony, Swift described how her debilitating depression had already required a six-month convalescence when Postal Service terminated her employment.  That convalescence was to last for over two more years.  In any event, Swift does not even claim that she could perform the essential functions of the job--indeed, her own evidence proves exactly the opposite.  As Waggoner v. Olin Corp., 169 F.3d 481, 482 (7th Cir. 1999) has phrased it, to view Swift as a qualified individual would be wholly at odds with the "rather common-sense idea" embodied in that concept.

While her inability to work for the "multi-month period" is thus fatal to her claim, it is also noteworthy that Swift failed to request any form of accommodation from Postal Service.  On that score Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co., 201 F.3d 894, 899 (7th Cir. 2000) has announced "the standard rule is that a plaintiff must normally request an

_____

the employee's disability, it approved this Court's own
interpretation of "qualified individual" (Case No. 00 C 5378,
2002 WL 1052036 (N.D. Ill. May 24)).

accommodation."[10]  Swift's deposition testimony confirms that she did not request any kind of accommodation, such as permission to work part-time or to work from home, because even with such accommodation she still did not believe that she could "physically do it because of [her] illness" (S. Dep. at 207).

Importantly, the just-completed exploration of the accommodation issue is thus academic:  No identifiable accommodation would have allowed the debilitated Swift to perform the essential functions of her job.  Hence, with Swift having failed to adduce sufficient evidence to show that she was a "qualified individual" who could perform the "essential functions" of her position either with or without accommodation, she is plainly not entitled to Rehabilitation Act protection.

<u>Conclusion</u>

Because this Court has held this case is totally lacking in any genuine issue of material (that is, outcome-determinative) fact, Postal Service is entitled to a judgment as a matter of law as to Swift's Rehabilitation Act claim.  Postal Service's Rule 56

---

[10]  <u>Jovanovic</u>, <u>id</u>. at 899 did recognize that an employee's mental disabilities may make it more difficult to communicate both the fact that she is mentally distressed and the fact that she may need an accommodation.  To be sure, that increased difficulty requires an employer to "meet the employee halfway" and to "do what it can to help" (<u>id</u>.).  Here Postal Service was unable to offer Swift any accommodation for her mental disability because <u>she</u> failed to engage in the interactive process--numerous Postal Service phone calls and letters to Swift went unanswered, and she refused to discuss it because, according to Swift, "her illness was nobody's business" (P. St. ¶20).

motion for summary judgment is therefore granted, and this action

is dismissed.

_____
Milton I. Shadur
Senior United States District Judge

Date:  October 3, 2006